333 Mich. 462 (1952)
53 N.W.2d 335
In re CHAMBERS' ESTATE.
GEORGE
v.
CHAMBERS.
Docket No. 61, Calendar No. 45,182.
Supreme Court of Michigan.
Decided May 16, 1952.
Henry W. Harmon (James A. Markle and Richard G. Eubank, of counsel), for proponent.
Henry J. Meurer (David Goldman, of counsel), for contestants.
SHARPE, J.
This is a will contest in which issues of fact were presented to a jury. The following facts are not in dispute. In 1932 or 1933 Gus Chambers, who had been living on a farm in Macomb county, came to Detroit. He operated a confectionery on Woodward avenue south of Jefferson avenue. He was a single man, had 1 brother, Bill Chambers, and *464 1 sister, Marie Hadjigeorgion, who lived in Greece. About the time Gus Chambers came to Detroit he lived with Mr. and Mrs. Harry George at 8523 Montlieu avenue in Detroit. Stella George was his cousin. In November, 1947, Gus Chambers bought a farm in Romeo, Macomb county. He remained there about 2 weeks, when he came back to live with his cousin, Stella George, Detroit. In March, 1948, Gus Chambers went back to the farm, and stayed there all summer. He returned to the George home either in October or November, 1948.
On November 29, 1948, Gus Chambers went to Woman's Hospital, where it was discovered that he had carcinoma of the esophagus, and on December 10, 1948, it was discovered that he had cancer of the stomach. He was discharged from the hospital on December 23, 1948, and returned to the home of Stella George, where he remained until his death February 6, 1949.
A few days before he was operated on he requested Stella George to send George Patru to see him. George Patru was a countryman of his, spoke both English and Greek, active in church affairs, and a real estate man with 30 years' experience. George Patru went to see Gus Chambers on the morning of December 8, 1948, at about 9:30 a.m. Gus Chambers told him that he was to be operated on, and that he wanted a will made (so as to) leave everything to his cousin, Stella George.
George Patru took the information to Attorney Henry W. Harmon, who drew the will in question. On the afternoon of the same day George Patru and his brother, James Patru, returned to the hospital where Gus Chambers executed the will. On February 11, 1949, Stella George filed a petition in the probate court of Wayne county, asking for the probate of the will. In her petition she alleged that Gus Chambers was a resident of Detroit, Michigan, *465 and left real estate of the value of $15,000, and personal property of the value of $5,500.
On May 2, 1949, Bill Chambers filed objections to the admission of the purported last will and testament of deceased Gus Chambers. The objections listed are as follows:
"1. That the testator was not of sound and disposing mind and memory and was not possessed with sufficient testamentary capacity to make his will, and that the testator was mentally incompetent at the time he made said will.
"2. That the testator was afflicted with a serious disease at the time of the execution of said purported will and was physically incapacitated as well as mentally incapable of knowing and understanding what he was doing; that the testator was also at the time of making said purported will suffering with certain mental disorders and delusions.
"3. That said testator was unduly influenced and coerced into making said will and that the same was coupled with fraud.
"4. That said purported last will and testament of the testator was not executed and/or witnessed in conformity with the statutes of the State of Michigan made and provided."
On May 16, 1949, Bill Chambers made and filed an application for the certification of the will contest to the circuit court. On the same day the probate court of Wayne county certified the will contest to the circuit court of Wayne county. On March 2, 1949, Bill Chambers filed a petition for special administration of the estate of Gus Chambers, in which he alleged that Gus Chambers was an inhabitant of the city of Detroit at the time of his death. The cause came on for trial, testimony was taken, the cause submitted to a jury, who found for the proponent of the will.
On February 24, 1950, contestant, Bill Chambers, for himself and his sister, Marie Hadjigeorgion, *466 filed a motion for a judgment non obstante veredicto, and in the alternative that the verdict be set aside and a new trial granted. Some of the reasons stated are that the verdict of the jury is against the great weight of the evidence; because the verdict was not rendered in accordance with the court's instructions, nor based upon evidence produced at the trial of the cause. On April 4, 1950, contestant, Bill Chambers, filed a motion to vacate the verdict of the jury and dismiss all proceedings in the cause. The reasons given are as follows:
"1. Because it is the undisputed testimony in this will contest that the deceased, Gus Chambers, was at the time of his death, a resident of the county of Macomb, State of Michigan,  and that therefore, neither the probate court or the circuit court of Wayne county had, or presently has jurisdiction in said cause.
"2. Because the statute made and provided for, being CL 1948, § 701.19 (Stat Ann 1943 Rev § 27.3178[19]), specifically confines jurisdiction to the judge of probate of the particular county where the deceased was an inhabitant of, or resident of, at the time of his death.
"3. That the law in this State is clear and authoritative to the effect that jurisdiction of the subject matter of a suit cannot be conferred upon a court by conduct of litigants or by stipulation  nor can the court assume or take jurisdiction of a matter where the deceased is a resident of another county at the time of his demise.
"4. That on the record in this will contest matter, the circuit court for the county of Wayne as well as the probate court for the county of Wayne is lacking jurisdiction."
On April 4, 1950, proponent, Stella George, filed a petition to quash contestant's motion. The reasons given are as follows:
*467 "1. Because said motion is not seasonably filed in accordance with Court Rule No 47 (1945), governing and regulating the practice and procedure in filing such motions, which requires that same be filed and a copy served on the opposite party within 20 days after the entry of judgment or 20 days after the rendition of a verdict in the trial by jury as the case may be.
"2. Because the verdict of the jury was rendered on the 15th day of February, 1950, and contestant's motion was filed on March 30, 1950, or approximately a month and a half after the rendition of said verdict.
"3. Because the sole question raised by contestant's motion was not raised on the trial of said cause and cannot be raised for the first time on the motion as now submitted.
"4. Because one who enters his appearance in an action and makes contest on the merits, submits himself to the jurisdiction of the court and waives all objections to process and pleadings not expressly waived.
"5. Because the right to contest a will is purely statutory and under the statute (CL 1915, § 14145)[*] one who appeals from an order of the probate court to circuit court must assign his reasons for the appeal and the issue in the circuit court is confined to such reasons.
"6. Because the appeal as filed in this cause makes no claim or reference to the jurisdiction or the lack of it as to either the deceased or the subject matter, and the sole scope of review in circuit court under appeal depends on the reasons stated in the appeal from probate court."
On May 17, 1950, the trial court entered an order, a part of which reads as follows:
"Therefore, it is ordered and adjudged, notwithstanding the verdict of the jury  the decedent was at *468 the time of his death a resident of Romeo in the county of Macomb, State of Michigan, and that the instrument purporting to be the last will and testament of said deceased is not in fact and does not constitute the last will and testament of said deceased, and said will is therefore disallowed."
Plaintiff appeals and urges that the circuit court of Wayne county had jurisdiction to hear and determine the will contest. In the case at bar Gus Chambers lived in Detroit from 1932 until the time of his death, with the exception of 2 or 3 weeks during the summer of 1947, and all of the summer of 1948; that when he went to the hospital he gave his home address as Detroit, Michigan; that when Stella George filed her petition for probate of the will she gave his address as Detroit, Michigan, and that when Bill Chambers filed a petition in the probate court of Wayne county for the appointment of a special administrator, he gave deceased's address as Detroit, Michigan. It also appears that when the will contest was certified from the probate court to the circuit court no mention was made of the lack of jurisdiction. The first time that this issue appears in the case was on April 4, 1950, when contestant filed a motion to vacate the verdict and dismiss the proceedings. Citation of authority is unnecessary to establish the fact that the probate court and circuit court have jurisdiction to hear and determine issues involving the validity of wills. In Joy v. Two-Bit Corporation, 287 Mich 244, 253, we quoted with approval from Richardson v. Ruddy, 15 Idaho 488 (98 P 842), as follows:
"Jurisdiction over the subject matter is the right of the court to exercise judicial power over that class of cases; not the particular case before it, but rather the abstract power to try a case of the kind or character of the one pending; and not whether the particular case is one that presents a cause of action, or under *469 the particular facts is triable before the court in which it is pending, because of some inherent facts which exist and may be developed during the trial."
The statutes of the State of Michigan provide:
"Sec. 21. Jurisdiction assumed in any case by a judge of probate, so far as it depends on the place of residence of any person, or the location of his estate, shall not be contested in any suit or proceeding whatever, except in an appeal from the probate court in the original case, or when the want of jurisdiction appears on the same record." CL 1948, § 701.21 (Stat Ann 1943 Rev § 27.3178 [21]).
In the case at bar the record affirmatively shows jurisdiction, not only of the subject matter, but also of the parties, moreover the issue of jurisdiction was not raised on certification. In Re McLouth's Estate, 290 Mich 311, 320, we said:
"When litigation instituted in the probate court is taken by appeal or certification to the circuit court, the latter court exercises appellate jurisdiction only and is restricted to the issues presented by reasons assigned in support of the appeal. CL 1929, § 15958 (Stat Ann § 27.3158)[**]."
In view of the fact that the question of jurisdiction was not raised in the reasons assigned in the certifications from the probate court to the circuit court, it follows that it is now too late to inject that issue into the proceedings.
Proponent urges that the verdict of the jury finding that the paper writing purporting to be the last will and testament of Gus Chambers, deceased, was in fact his last will and testament, is supported by competent evidence, and the trial court was in error in finding otherwise. Under the circumstances of this case the testimony in support of the verdict of *470 the jury must be considered in the light most favorable to sustaining the verdict. See In re Hallitt's Estate, 324 Mich 654. It is also the rule that if the evidence presented issues of fact for the consideration of the jury, such verdict should be sustained. See In re Cummins' Estate, 271 Mich 215.
At the trial proponent produced George Patru, who testified as follows:
"I live in the city of Detroit, at 14239 Saratoga avenue. I am married. I am in the real estate business. My office is in the David Stott Building. I knew Gus Chambers in his lifetime.
"Q. I will show you proponent's exhibit No 1 (will), and ask you whether or not your name appears on that instrument.
"A. It does.
"Q. Which one is your signature?
"A. The first one.
"Q. Did you sign that as a witness to this purported will?
"A. Yes, sir.
"Q. At whose request?
"A. Gus Chambers. * * *
"Q. What is the other signature on that purported will, Mr. Patru?
"A. As a witness is my brother, James N. Patru.
"Q. He also signed that as a witness?
"A. Yes, sir.
"Q. Did he sign that as a witness in your presence?
"A. Yes, sir.
"Q. Were you all present at the same time before Mr. Chambers?
"A. Yes, sir.
"Q. Who else was present, if anyone?
"A. Just the 3 of us. * * *
"The Court: Mr. Chambers asked you to witness that instrument, did he?
"A. Yes, sir.
"The Court: And did you see him write his name there?
*471 "A. Yes, sir.
"The Court: In your presence?
"A. Yes, sir.
"The Court: And in the presence of your brother?
"A. Yes, sir.
"The Court: And your brother witnessed it?
"A. Yes, sir.
"The Court: And it was all done in the presence of each other, is that right?
"A. Yes, sir.
"The Court: Was Mr. Chambers of full age?
"A. Yes, sir.
"Q. (By Mr. Harmon): And to the best of your knowledge or your observation what was his mental condition?
"A. I would say perfect.
"Q. This was his free act and deed?
"A. Definitely, free act and deed. * * *
"Mr. Harmon drew the will. I got the information in the morning. I took the information to Mr. Harmon. The will was drawn and the same afternoon I went back again.
"My brother was working across the street from the hospital. I called him in advance, whether or not he could spare 15 or 20 minutes to go with me and witness  I didn't think of getting one of the nurses. * * *
"The Court: What information did you bring back after you discussed it, to the lawyer?
"A. His name, address, and that he wanted to leave with his cousin, whatever he would have, he wanted to leave with his cousin, whatever he would have at the time of death, cash, bonds, insurance, real or personal property. * * *
"The Court: Did Gus read it?
"A. Yes, sir.
"The Court: I see there is no mention of Gus' sister in this will?
"A. Oh, no; that information he gave me, that he wanted to leave everything with his cousin, and if the sister in Greece would need any help, that he had *472 confidence in Mrs. George that Mrs. George would do the right thing by her. * * *
"The Court: What did you do with it?
"A. I left it with him.
"The Court: You left it right there?
"A. Yes.
"The Court: You never saw it again?
"A. Until now.
"Mrs. George was not there at any time when I talked to him. I don't know whether Mrs. George went to the hospital that day or not. I did not talk with Mrs. George on December 8th. I don't remember exactly when I talked with Mrs. George; perhaps 3 or 4 days later. I don't remember where the conversation took place. It was, possible, likely, on the telephone. I am not sure. It was not at her home. I was not at her home. I could have been at my office, because around the 15th of the month she comes to my office and makes a payment or sends it with someone; perhaps she came in that particular month. I don't remember. * * *
"Q. Within that 15 or 20 minutes, just what questions did you ask him, if any?
"A. I don't believe I asked any questions. He simply told me what he wanted. He wanted to prepare a will and, of course, I believe I asked him  I think I had to ascertain the proper spelling of his name, permanent address, and to whom he wanted to leave his estate, if there was any other people that he wanted to leave parts to, or any other thing that he wanted to put in the will, and the conclusion was, as stated yesterday."
James Patru was sworn as a witness for proponent and testified:
"I live at 4189 Dickerson street, Detroit. I am married and have a family. I used to be in the bar business, but I'm not doing anything now.
"Q. (By Mr. Harmon): Now, Mr. Patru, I will show you proponent's exhibit No 1, which purports to be the last will and testament of Gus Chambers, *473 and ask you whether or not your name appears on that instrument?
"A. Yes, sir.
"Q. And will you point it out to us? Is your signature the first one or the last one?
"A. Between the 2.
"Q. Your signature is the last one?
"A. That is true.
"Q. Did you sign that?
"A. Yes, sir.
"Q. Did you sign that in the presence of Mr. Chambers?
"A. Mr. Chambers and Mr. Patru.
"Q. And did Mr. Chambers tell you what it was?
"A. Mr. Chambers read this will and he signed it.
"Q. He signed it in your presence?
"A. Yes, sir.
"Q. And you were there and Mr. Chambers was there, and your brother was there?
"A. That is right. * * *
"Q. What did you observe as regarding his mental condition at that time?
"A. Very fine shape.
"Q. Was he mentally alert? Did he know what he was talking about?
"A. That is right.
"Q. You didn't see anything irregular or irrational about his conversation?
"A. What?
"Q. Did you observe anything irrational about his talk or about his conduct while you were there?
"A. His talk was fine, yes.
"Q. What about his conduct, otherwise?
"A. Very good.
"The Court: How long were you there?
"A. Approximately 15 minutes.
"The Court: You talked about some other things beside the will? * * *
"The Court: Did you see Gus Chambers sign this paper? (Indicating.)
"A. Yes, sir.
*474 "The Court: In your presence?
"A. Yes.
"The Court: And in the presence of your brother?
"A. Yes, sir. * * *
"I am not related to Mrs. George. I know her. I saw her recently a couple of days ago. I also saw her 2 days after the will. She came in for a cup of coffee. She didn't ask me anything about it. I don't think she knew anything about it.
"A. He read the will and he signed his name and turned it over to my brother, my brother signed it, and I signed it, and my brother took the envelope and put the will in it, and gave it to him and left it there.
"Q. What, if anything, did he say?
"A. He didn't have very much to say.
"Q. What did he say?
"A. Well, he was not feeling so well and he was going to be operated in a couple of days, and that is all.
"Q. How long did it take for him to say that?
"A. Well, we was in the room approximately 10 to 15 minutes. * * *
"In the hospital Gus was in bed. He had a pillow on the back and he was half down in bed and he was reading the magazine. I heard the will read by my brother."
Contestant urges that there was no evidence to refute the presumption that undue influence amounting to fraud was practiced in obtaining the signature of deceased to an instrument purporting to be his last will and testament. Contestant offered evidence to the effect that deceased stated to several witnesses that he took care of everything and that his brother Bill would get his property. There is also evidence offered by proponent that 2 or 3 days before his operation deceased requested Stella George to get in touch with George Patru and have him come to see him; that Stella George did notify George Patru of the request of Gus Chambers, and George Patru *475 came to the hospital to see Gus Chambers, who informed him that he wanted to make a will; that George Patru took down the information given, went to a lawyer to have the will drafted and returned to the hospital with his brother; that Gus Chambers read the will and George Patru read it out loud to Gus Chambers, who signed it in the presence of 2 witnesses, and that the witnesses signed it in the presence of Gus Chambers.
In our opinion the mental capacity of Gus Chambers to make a will and its proper execution presented questions of fact that were properly submitted to the jury. It follows that the motion for a judgment non obstante veredicto should have been denied. The judgment is reversed and the cause remanded for certification to the probate court, with costs to proponent.
NORTH, C.J., and DETHMERS, BUTZEL, CARR, BUSHNELL, BOYLES, and REID, JJ., concurred.
NOTES
[*] See CL 1948, § 701.36 (Stat Ann 1943 Rev § 27.3178[36]).  REPORTER.
[**] See CL 1948, § 701.36 (Stat Ann 1943 Rev § 27.3178[36]),  REPORTER.